## STATE OF CONNECTICUT *v.* VICTOR TORRES
### (14279)

Lavery, Landau and Schaller, Js.

Argued December 4, 1995—officially released May 28, 1996

*Susan M. Hankins*, assistant public defender, for the appellant (defendant).

*Nancy L. Gillespie*, deputy assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *John J. Davenport*, deputy assistant state's attorney, for the appellee (state).

LANDAU, J. The defendant, Victor Torres, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a)[1] and 53a-54a (a).[2] The

---

[1] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[2] General Statutes § 53a-54a (a) provides in pertinent part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

defendant claims that the trial court improperly (1) denied his motions for judgment of acquittal and for a new trial, and (2) deprived him of his constitutional rights to freedom of association, due process, and a fair trial by admitting evidence that he was a member of a gang thereby allowing the jury to find him "guilty by association."

The jury could reasonably have found the following facts. The defendant was a "regional commander" of a street gang known as the "Latin Kings." For several weeks, the defendant's gang was involved in an ongoing dispute with a rival gang known as "Los Solidos." In the afternoon hours of September 26, 1993, the Latin Kings conducted an emergency meeting at Morales' Cafe to discuss a recent incident in which a member of their gang was shot at by a member of the rival gang. During the meeting, Jose Martinez, a member of the gang and a witness for the state, served as a lookout. Although Martinez had attended nine prior gang meetings in which the defendant had been present, he did not attend the emergency meeting, nor did he know whether the defendant was there. At the meeting, the gang devised a plan to retaliate for the shooting incident by killing a member of Los Solidos.

After the meeting, Jose Velez, another gang member, instructed Martinez to keep watch for rival gang members from the roof of a four-story building located on East Clay Street. When Martinez arrived, four other gang members, including Velez, were already there. The group possessed an assortment of firearms including an M-16 rifle with a scope, a shotgun and several handguns. Velez had a portable CB radio that he used to maintain contact with other gang members, some of whom had remained at Morales' Cafe, which was referred to by the gang as "sector one." Other gang members were stationed in different locations throughout the area.

At approximately midnight, the victim, Ana Plaza, was returning to her home at 79 East Clay Street, which is located across the street from the building where the group stood lookout on the roof. Plaza was accompanied by her son, Obdulio, her daughter, Melissa, and her infant granddaughter. As Plaza and her family prepared to enter Plaza's house, Velez and the others observed their actions from the rooftop. Velez had a brief conversation over the portable radio with an unknown individual about the activity at the Plaza residence. Immediately following that conversation, Velez instructed his people to fire at the Plaza family. At least three gang members immediately opened fire discharging several rounds of ammunition for a duration of approximately twenty seconds.

As a result of the gunfire, Ana Plaza was struck by a bullet in her hip and Melissa was struck by a bullet in her arm. As both women began screaming, Obdulio ran into the house and phoned the police and an ambulance. Meanwhile, the shooters fled from the roof of the building into a vacant apartment, stuffed their weapons into a duffel bag and ran from the area.

Approximately ten days later, the police arrested the defendant and several other members of the Latin Kings. In an oral statement to Detectives Robert Henderson and Mark Deal of the Waterbury police department, the defendant admitted that he was a member of the Latin Kings and that he held the rank of regional commander at the time of the shooting. Although the defendant denied any personal involvement in the shooting, he informed the police that several members of a gang called the "Nietas," who were allied with his gang, were responsible for the shooting. The defendant stated that one of the shooters was called "Cano," and that a Latin King called "Rambo" had helped with the disposal of the weapons used in the shooting.

In his first claim, the defendant asserts that the state failed to present sufficient evidence to support his conviction for conspiracy to commit murder. He argues that, although the evidence established that certain members of his gang planned to kill an unspecified rival gang member, the state failed to present sufficient evidence to prove that the defendant knew of or agreed to the plan. He argues that the state's evidence failed to establish that he had the specific intent to conspire and the specific intent to commit murder, both of which are necessary elements of the charge of conspiracy. In contrast, the state posits that there was sufficient evidence from which the jury could infer both disputed elements of intent.

"In accordance with well established principles, appellate analysis of a claim of insufficiency of the evidence requires us to undertake a twofold task. We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Goodrum*, 39 Conn. App. 526, 531–32, 665 A.2d 159, cert. denied, 235 Conn. 929, 667 A.2d 554 (1995). Findings of fact that are consistent with guilt are afforded great deference unless they are improbable and unconvincing. *State* v. *Osman*, 218 Conn. 432, 437, 589 A.2d 1227 (1991).

"To establish the crime of conspiracy under § 53a-48 of the General Statutes, the state must show that there was an agreement between two or more persons to

engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of conspiracies, a conviction is usually based on circumstantial evidence. . . . Moreover, it is well settled that conspiracy is a specific intent crime, with the intent divided into two parts: (1) the intent to agree to conspire; and (2) the intent to commit the offense that is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also they intended to commit the elements of the offense." (Citations omitted; internal quotation marks omitted.) *State* v. *Estrada*, 28 Conn. App. 416, 420–21, 612 A.2d 110, cert. denied, 223 Conn. 925, 614 A.2d 828 (1992).

"Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994). In a conspiracy prosecution, when determining both a defendant's specific intent to agree and his specific intent that the criminal acts be performed, the jury may rely on reasonable inferences from facts in the evidence and may develop "a chain of inferences, each link of which may depend for its validity on the validity of the prior link in the chain." Id., 130.

Having stated these principles to guide us, we proceed with our analysis. The state argues that, from the

evidence presented, the jury could conclude that the defendant's intent to agree to the conspiracy and to kill a rival gang member was established beyond a reasonable doubt. The state contends that the evidence established that the defendant was in the vicinity of the occurrence that day, that he was a regional commander of the Latin Kings, that he had been present at several previous gang meetings that Martinez attended, and that the retaliatory plan to kill a member of Los Solidos was conceived at the emergency meeting. Because of the defendant's position in the gang, his routine attendance at previous Latin Kings meetings, and the radical nature of the planned operation and its probable consequences, the state asserts that it was reasonable for the jury, in the exercise of common sense and ordinary intelligence and experience, to infer that the defendant had attended the earlier meeting at Morales' Cafe.

The state further claims that even without drawing the specific inference that the defendant had attended the meeting, it was reasonable for the jury to have inferred that, because the defendant held the position of regional commander, he necessarily knew about the existing conflict between his gang and Los Solidos and the earlier shooting of a Latin Kings member by a Los Solidos member. This knowledge, coupled with Martinez' testimony that he recognized the defendant's voice coming over Velez' portable radio shortly before the shooting, constituted circumstantial evidence sufficient to provide the jury a basis to infer that the defendant knew about the plan and acted in concert with the other gang members. The state finally contends that the jury could have reached the same inference as a result of the defendant's statement to the police, which the state claims contained "inside information" regarding the identity of one of the shooters and of the person who disposed of the guns.

In summary, the state attempts to build its case on a foundation comprised of three facts: (1) The defendant was a regional commander in the Waterbury Latin Kings gang; (2) Martinez heard the defendant's voice over Velez' portable radio on the rooftop sometime during the evening of the occurrence; and (3) the defendant displayed inside knowledge of the shooting when he was interrogated by the police ten days later. The difficulty we have in accepting the state's argument is the lack of predicate facts from which the jury could reasonably have drawn the appropriate permissive inferences that the defendant was present at the emergency meeting or was in communication with the rooftop shooters. Furthermore, there is nothing in the defendant's oral statement to the police to allow the jury to infer that he had prior knowledge of the conspiracy.

"A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion. *State* v. *Amarillo*, 198 Conn. 285, 300–302, 503 A.2d 146 (1986); see also *State* v. *Shine*, 193 Conn. 632, 644–45, 479 A.2d 218 (1984); *State* v. *Johnson*, 185 Conn. 163, 167–69, 440 A.2d 858, aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983); *State* v. *Vasquez*, 182 Conn. 242, 246–48, 438 A.2d 424 (1980). *State* v. *Palmer*, 206 Conn. 40, 47–48, 536 A.2d 936 (1988). . . . *State* v. *Cooper*, [227 Conn. 417, 442–43, 630 A.2d 1043 (1993)]." (Internal quotation marks omitted.) *State* v. *Turmon*, 34 Conn. App. 191, 200, 641 A.2d 138 (1994). "Where a group of facts is relied on for proof of an element of a crime it is the cumulative impact that is to be weighed in deciding whether the standard of proof beyond a reasonable doubt has been met and each individual fact need not be proven in accordance with that standard. It is only where a single fact is essential to proof of an element, however, that such evidence must support the inference of that fact beyond a reasonable doubt." *State*

v. *Williams*, 27 Conn. App. 654, 672–73, 610 A.2d 672, cert. denied, 223 Conn. 914, 614 A.2d 829 (1992).

Although the state asserts that Martinez' testimony provided sufficient circumstantial evidence of the defendant's conduct to establish its claims that "the defendant communicated with the rooftop shooters shortly before the shooting," and that the defendant was present at the emergency meeting, there is nothing in the record to substantiate these claims. To the contrary, Martinez' testimony is devoid of any information concerning the defendant's conduct.

Martinez testified that he never saw, or communicated with, the defendant in any manner on the day of the shooting. Martinez did not attend the emergency meeting, nor did he have any knowledge of whether the defendant attended the meeting. Martinez stated that he did not receive any orders from the defendant concerning where, or for what reason, he was to be a lookout on the day of the shooting. Although Martinez claims to have heard the defendant's voice emanate from Velez' portable radio while the gang members were on the roof, he could not remember what time he heard the defendant's voice nor did he ever testify to the nature, length, or substance of what the defendant allegedly said. Martinez was certain, however, that he and the other gang members had been on the rooftop "[f]or a couple of hours" prior to the shooting, and that, although a radio transmission immediately preceded Velez' order to shoot, that transmission was not the one in which he claimed to have heard the defendant's voice. On the basis of this evidence, we conclude that it was unreasonable for the jury to infer either that the defendant attended the meeting at Morales' Cafe or that he communicated directly with the gang members who did the shooting.

Nevertheless, the state maintains that, because Martinez testified that he heard the defendant's voice over

the portable radio, there was proof that the defendant was present at one of the sectors established for purposes of the plan. This argument lacks merit because, although Martinez testified that the defendant's voice emanated from sector one, he did not say how or why he believed that to be so, other than to say "[be]cause . . . that he was in section one." Martinez admitted that he was not at sector one at all that night and that he "didn't really hear what [the defendant] said." Thus, there were no predicate facts before the jury that would lend support to Martinez' conclusion that the defendant communicated with the rooftop participants. Accordingly, there is no evidence from which the jury could infer anything about the defendant's whereabouts on the night of the shooting.

Moreover, because Martinez was not at sector one that night and did not hear what the defendant allegedly stated to Velez over the radio, the state's assertion that the defendant's overheard voice was a "communication from the [command] post" is a mischaracterization of the evidence. Even if the jury gave full credit to Martinez' testimony that he was able to recognize the defendant's voice coming over the portable radio, there was no evidence that sector one was the command post, that the defendant was ever at sector one, or that the defendant disclosed his location during the alleged transmission. The state's assertion, therefore, does not provide an adequate basis to allow us to conclude that the jury could infer, beyond a reasonable doubt, that the defendant participated in the conspiracy. Indeed, on the sparse evidence presented, we conclude that there is no basis for any such inference to be drawn by the jury without resorting to speculation and guesswork. A suspicion of illegal activity on the part of the defendant does not satisfy the state's burden of proving its case beyond a reasonable doubt. *State* v. *Arbelo*, 37 Conn. App. 156, 161–62, 655 A.2d 263 (1995).

The state points to the evidence that the defendant was a regional commander of the Latin Kings to buttress its contention that, by virtue of his gang membership and rank, knowledge of the conspiracy may be imputed to him. The state further argues that the presence of the defendant "at all of the previous meetings attended by Martinez" supports an inference that he was aware of the conspiracy. The record, however, does not justify these assertions. First, contrary to the state's contention that the defendant always attended the gang meetings, Martinez testified that the defendant "*sometimes* was there but he didn't conduct the meetings." (Emphasis added.) Martinez also testified that the meetings he had attended in the past were all conducted by the president of the gang, an individual other than the defendant. Second, there is no evidence in the record describing either the role of a regional commander within the gang or the gang's method of disseminating information to its members. When these factors are considered in conjunction with the lack of proof that the defendant attended the emergency meeting, we conclude that it was unreasonable for the jury to infer that the defendant necessarily knew about and intended to participate in the conspiracy solely on the basis of his gang membership and rank.

Finally, the state maintains that the defendant's statements during custodial interrogation ten days after the incident were evidence of his prior knowledge of and participation in the conspiracy. We do not agree.

Our review of the record reveals that there was nothing of an inculpatory nature in the defendant's responses to Detective Henderson's questions despite Henderson's opinion that the defendant "was reluctant to admit his involvement" in the conspiracy. To the contrary, Henderson testified that the defendant expressly denied any involvement in the conspiracy, and that the defendant could have learned whatever

information he possessed about the shooting after it had occurred.

Henderson interrogated the defendant, and at least two other gang members, on October 6, 1993, nearly ten days after the shooting. Henderson testified that he did not take notes during the defendant's statement nor did he tape-record the defendant's statement. Relying solely on his memory of the defendant's interrogation, Henderson prepared a supplemental police report the following day. Henderson testified that he could not remember whether he ever asked the defendant how he acquired the information he conveyed to the police concerning the shooting. As a result, Henderson's testimony does not provide any indication that the defendant had prior knowledge of the conspiracy merely because he named one of the shooters and the person who disposed of the weapons.

Because the evidence established that there were at least six gang members on the roof and several others stationed in the area, the information the defendant told to Henderson was known to many people and was, therefore, not "inside information" exclusive only to the defendant, as characterized by the state. The record is devoid of any information regarding the source of the defendant's knowledge and there is no basis for the jury reasonably to infer the defendant's guilt based on his statements to the police. Thus, the state's description of the defendant's statements evincing inside information only presupposes the defendant's participation in the conspiracy; it does not support a finding of guilt beyond a reasonable doubt.

We conclude that, when evaluated under the appropriate standard, the evidence in this case is insufficient to support the defendant's conviction of conspiracy to commit murder.

The judgment is reversed and the case is remanded with direction to render judgment of acquittal.[3]

In this opinion LAVERY, J., concurred.

SCHALLER, J., dissenting. Because I disagree with the majority on the appropriate scope of review to be applied to the jury verdict in this case, I respectfully dissent. With respect to the second claim of the defendant, I conclude that the trial court did not violate the defendant's constitutional rights by admitting evidence of the defendant's gang membership.

I

My disagreement with the majority concerning the insufficiency claim is based primarily on the application of the traditional principles of appellate review to the jury verdict in this case. It is useful to summarize the essential principles. "We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. . . . *State* v. *Joyner*, 225 Conn. 450, 455, 625 A.2d 791 (1993). [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . *State* v. *Grant*, [219 Conn. 596, 604, 594 A.2d 459 (1991)]. . . . *State* v. *Fran-*

---

[3] In view of our remand, we do not reach the defendant's second claim.

*cis,* [228 Conn. 118, 127, 635 A.2d 762 (1993)]; see also *State* v. *Patterson,* [229 Conn. 328, 332, 641 A.2d 123 (1994)]; *State* v. *Greenfield,* [228 Conn. 62, 76, 634 A.2d 879 (1993)]; *State* v. *Rasmussen,* 225 Conn. 55, 73–74, 621 A.2d 728 (1993)." (Internal quotation marks omitted.) *State* v. *Sivri,* 231 Conn. 115, 132, 646 A.2d 169 (1994).

I emphasize, as our Supreme Court did in *Sivri,* that "[u]nder [this] scope of review and its application, we give deference not to the hypothesis of innocence posed by the defendant, but to the evidence and the reasonable inferences drawable therefrom that support the jury's determination of guilt. On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." Id., 134.

Once the jury has determined guilt, "and has determined that, in its best judgment, the hypothesis or hypotheses of innocence posed by the defendant are no more than 'possible' as opposed to 'reasonable' . . . that jury determination is entitled to deference on appeal. It would be inconsistent with the entire process of trial fact-finding for an appellate court to do otherwise. . . . [T]o do so . . . would in effect permit an appellate court to substitute a different view of the evidence from the reasonable view taken by the jury." (Citations omitted.) Id., 134–35. That is precisely what the majority has done in this case. By failing to give appropriate deference to the jury's findings and inferences, the majority has substituted its own view of the evidence and reached a different result.

The majority has chosen to discredit the evidence that the jury chose to credit. I refer, in particular, to the majority's statements that "although [Jose] Martinez testified that the defendant's voice emanated from sector one, he did not say how or why he believed that to

be so," "nor did he ever testify to the nature, length, or substance of what the defendant allegedly said." In fact, the majority rejects Martinez' testimony that the defendant was in sector one, concluding that "there were no predicate facts before the jury that would lend support to Martinez' conclusion that the defendant communicated with the rooftop participants. Accordingly, there is no evidence from which the jury could infer anything about the defendant's whereabouts on the night of the shooting." Further, the majority states: "Even if the jury gave full credit to Martinez' testimony that he was able to recognize the defendant's voice coming over the portable radio, there was no evidence . . . to allow us to conclude that the jury could infer, beyond a reasonable doubt, that the defendant participated in the conspiracy." Those statements are not consistent with the principle of appellate review requiring us to defer to the jury's inferences rather than positing other possible inferences that the jury necessarily must have rejected.

Moreover, the majority posits that the state's description of the defendant's statements as indicating insider information about the shooting "presupposes the defendant's participation." The jury, having reached a guilty verdict, clearly inferred—not presupposed—the defendant's participation. A reviewing court must defer to those reasonable inferences that support the verdict. Finally, the majority engages in fact-finding contrary to the jury's fact-finding when it finds that "the information the defendant told to Henderson was known to many people and was, therefore, not 'inside information' exclusive only to the defendant . . . ." That assertion directly counters the inviolability of the jury process of drawing reasonable inferences.

Traditional analysis requires that, after appropriate deference to the facts found and inferences drawn by the jury, we determine whether the evidence and rea-

sonable inferences drawn by the jury fall short of establishing any element of the crime charged. In so doing, we must assume as true all facts, including states of mind, for the purpose of the challenge based on evidentiary insufficiency. If evidence existed from which the jury could have drawn reasonable inferences as to the defendant's intent to agree to conspire and intent to engage in conduct constituting the crime of murder, and that the agreement was followed by an overt act in furtherance of the conspiracy by any of the conspirators, the verdict must stand even if another fact finder might have declined to credit particular evidence or have drawn different inferences.

In this case, as the majority informs us, the evidence relied on by the state was that, at the time of the shooting, the defendant was a regional commander of the Waterbury branch of a street gang known as the Latin Kings. He had previously held the positions of "philosopher" and president of the Waterbury Latin Kings. Although there was no direct evidence that the defendant attended the September 26, 1993 emergency meeting on the afternoon of the shooting, the defendant had been present at the nine previous meetings attended by Martinez, the informant.

At that time, a "war" was going on between the Latin Kings and Los Solidos. Plans were made at the meeting to kill a member of Los Solidos that evening. The killing was to be in retaliation for a recent incident in which a member of Los Solidos had shot at a member of the Latin Kings. The killing would be done from the rooftop of a four-story apartment building located across the street from a house where a Los Solidos member lived. None of the Latin Kings assigned to the rooftop held leadership positions in the Latin Kings. The group assembled in a vacant apartment in the four-story building at about 4 p.m. and proceeded to the roof when it became dark.

The site of the meeting, a bar in the city known as Morales' Cafe, had been designated "sector one" as part of the plan to kill a member of Los Solidos. Communications between sector one and the rooftop took place by means of a CB radio. At some point in the evening, the defendant communicated with Jose Velez on the rooftop. Although the content of the conversation was not ascertained by Martinez, who was on the rooftop, he recognized the defendant's voice and testified that the defendant had made the communication from sector one. After that communication, the watch—and ultimately the shooting—continued and did not cease. Later, moments before the shooting, Velez again communicated with someone via CB, then gave the order to shoot the people, who were thought to be members of Los Solidos.

When the defendant was arrested ten days later, he admitted to Detective Robert Henderson that he was a regional commander of the Latin Kings but was "reluctant to admit" that he was involved in the shooting incident. He provided "information indicating that he had a lot of knowledge" about the incident—knowledge and information that was not available to the general public. That information included identifying "Cano" as the person who did the shooting, Cano's gang affiliation, and the fact that a member of the Latin Kings had disposed of the weapons.

From the evidence presented, the jury reasonably could have found that the defendant held a series of leadership positions in the Waterbury branch of the Latin Kings, including president, culminating in his position as regional commander. He regularly attended the Latin Kings meetings, including all of the meetings at which Martinez had been present. On the day of the emergency meeting, held in the midst of a "war" with a rival gang, he was present at the sector established as part of the conspiracy to shoot a member of Los

Solidos, and he communicated before the shooting with Velez on the rooftop. Because no Latin Kings leaders were on the roof, and since a CB communication immediately preceded the shooting, the jury reasonably could have inferred that Latin Kings leaders were at sector one, where the defendant, who was a leader, was located. From the defendant's leadership position, his regular attendance at meetings, the emergency nature of the situation and the fact that the defendant employed a CB for communication, all of which were integral parts of the plan to commit the murder, and that the plan proceeded without interruption after the defendant's communication with Velez, the jury reasonably could have inferred that the defendant knew of the plan to kill a member of Los Solidos, agreed to conspire to commit the murder, shared the intent to commit the murder and that a coconspirator committed an act in furtherance of the conspiracy.

Having drawn those reasonable inferences concerning the defendant's participation and shared intent, the defendant's disclosure ten days later, in Henderson's words, of "a lot of knowledge" about the incident, not readily available "in the general public" could have led to further reasonable inferences of the defendant's guilt of the crime charged. The fact that the evidence was disputed or that other inferences could have been drawn is not relevant to our review. As long as evidence existed from which the jury reasonably could have found the facts and drawn the inferences leading to its guilty verdict, it is our obligation to defer to those findings and inferences in passing on this sufficiency challenge.

The foregoing analysis has established that the jury's inferences were reasonably drawn and that the evidence was sufficient to prove the crime charged. Under those circumstances, the jury's chain of inferences is appropriate and a reasonable view of the evidence

exists that supports the jury's verdict of guilty. Id., 130. An appellate court is not entitled to "sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . *State* v. *White*, 229 Conn. 125, 142–43, 640 A.2d 572 (1994)." (Internal quotation marks omitted.) *State* v. *Cruz*, 40 Conn. App. 515, 522, 672 A.2d 502 (1996). I acknowledge that "this is not an easy case [but] it is a case in which the jury's inference of an intent to kill [and intent to conspire] was sufficiently supported by the circumstantial evidence." *State* v. *Sivri*, supra, 231 Conn. 131.

## II

The defendant also challenges the trial court's admission of evidence of the defendant's membership and positions in the Latin Kings on both evidentiary and constitutional grounds. The defendant claims that the evidence of his status as a Latin King was proof of "guilt by association" and as such was more prejudicial than probative. He further asserts that the improper admission of this evidence deprived him of his constitutional right to freedom of association under both the Connecticut and United States constitutions.[1] Neither claim has merit.

## A

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. *Pitt* v. *Kent*, 149 Conn. 351, 357, 179 A.2d 626 (1962). . . . A party is not required to offer such proof of a fact that it excludes all other hypotheses; it is sufficient

---

[1] Although the defendant asserts that his right to due process and a fair trial was also violated, he fails to analyze this claim. Accordingly, I decline to address it.

if the evidence tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. *State* v. *Miller*, 202 Conn. 463, 482, 522 A.2d 249 (1987); *State* v. *Morrill*, 197 Conn. 507, 548, 498 A.2d 76 (1985)." (Citations omitted; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 305–306, 664 A.2d 743 (1995).

The defendant argues that the evidence of his Latin Kings membership was not probative and prejudiced him by allowing the jury to infer bad character and a propensity to commit the type of offense charged. I conclude, however, that the evidence of gang membership and leadership in this case was relevant to the criminal charge of conspiracy to commit murder, which directly involved group activity. The evidence established that the defendant's presence in sector one and his communication with Velez on the rooftop were not merely coincidental with the plan to kill a member of Los Solidos. Moreover, the charge involved a claim of group retaliation for an attack on a member of the Latin Kings. The evidence was probative of the basis of the defendant's relationship with other gang members and the existence of a conspiracy among the gang members. *State* v. *Mozell*, 40 Conn. App. 47, 51, 668 A.2d 1340 (1996); see *United States* v. *Hartsfield*, 976 F.2d 1349, 1352 (10th Cir. 1992) (defendant's membership in gang demonstrated relationship with coconspirator and existence of conspiracy). I further conclude that the trial court did not abuse its discretion in determining that the prejudicial impact of the evidence did not outweigh its probative value. See *United States* v. *Hartsfield*, supra, 1352.

## B

Because the defendant did not preserve the constitutional claim at trial, he can prevail only if he meets the four prongs of *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[2] The defendant fails to demonstrate that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial.

"[T]he First Amendment protects an individual's right to join groups and associate with others holding similar beliefs.[3] See *Aptheker* v. *Secretary of State*, 378 U.S. 500, 507 [84 S. Ct. 1699, 12 L. Ed. 2d 992] (1964); *NAACP* v. *Alabama ex rel. Patterson*, 357 U.S. 449, 460 [78 S. Ct. 1163, 2 L. Ed. 2d 1488] (1958)." *Dawson* v. *Delaware*, 503 U.S. 159, 163–64, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992). Nevertheless, "the Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations . . . simply because those beliefs and associations are protected by the First Amendment." Id., 165. An individual's right to join groups and associations is not violated where the evidence proves something more than an individual's abstract beliefs. Id., 167; *United States* v. *Abel*, 469 U.S. 45, 48, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984); see also *United States* v. *Hartsfield*, supra, 976 F.2d 1352.

As the previous discussion demonstrates, the evidence of the defendant's membership, including his leadership positions, in the Latin Kings was probative

---

[2] The four conditions of *Golding* are the following: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40.

[3] Although the defendant asserts that his rights under the Connecticut constitution could be greater than under the federal constitution, his analysis has failed to demonstrate this.

of the conspiracy to commit murder charge. Because the evidence of the defendant's association was relevant and probative of the issues in the case, the defendant's first amendment rights were not violated by the admission of the evidence. *Dawson* v. *Delaware*, supra, 503 U.S. 163–64. A conspiracy involves association, and the state may offer evidence of association within the framework of the conspiracy charged.[4]

Accordingly, I would affirm the judgment of the trial court and, therefore, respectfully dissent.

---

[4] The defendant also argues that the trial court failed to limit use of the association evidence. While the defendant may have been entitled to a limiting instruction, he has not indicated how this issue was preserved at trial. Pursuant to Practice Book § 4065 (d) (1), the party raising a claim must "include in the brief of that party or the appendix a verbatim statement of all relevant portions of the charge as requested . . . ." Because the defendant has not complied with § 4065 (d) (1) of the rules of practice, I decline to review this claim. *State* v. *Krzywicki*, 39 Conn. App. 832, 838, 668 A.2d 387 (1995) (Practice Book § 4061 assigns to appellant responsibility for providing record adequate for review).