STATE OF CONNECTICUT *v.* TAURUS KENNEY
(AC 17352)

Foti, Landau and Sullivan, Js.

Argued January 20—officially released May 18, 1999

*Norman A. Pattis,* for the appellant (defendant).

*John A. East III,* assistant state's attorney, with whom, on the brief, were *Scott J. Murphy,* state's attorney, *John F. Cronan,* acting state's attorney, *Michael Kennedy,* assistant state's attorney, and *Christopher L. Morano,* deputy chief state's attorney, for the appellee (state).

*Opinion*

LANDAU, J. The defendant, Taurus Kenney, appeals from his conviction, following a jury trial, of four counts

of the sale of illegal drugs in violation of General Statutes § 21a-278 (b), four counts of the sale of a controlled substance within 1500 feet of a public housing project in violation of General Statutes § 21a-278a (b), four counts of possession of narcotics in violation of General Statutes § 21a-279 (a), one count of conspiracy to sell narcotics in violation of General Statutes §§ 53a-48 and 21a-278 (b) and one count of threatening in violation of General Statutes § 53a-62. On appeal, the defendant claims that (1) there was insufficient evidence to support his conviction for conspiracy to sell narcotics, (2) the prosecutor engaged in a pervasive pattern of misconduct that violated the defendant's right to a fair trial and (3) the trial court improperly prevented him from effectively preparing for trial and deprived him of his right to prepare and present a defense. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. From August, 1995, to May, 1996, the New Britain police department and the statewide narcotics task force conducted an investigation of drug trafficking by gang members in various New Britain public housing projects. The defendant was one of a large number of people who were the target of this investigation, as he was known to be a founding member of a gang. On four separate occasions during the course of the investigation, the police, with the assistance of an informant, purchased cocaine from the defendant at his home at 132 Summit Road in the Pinnacle Heights public housing project. The police informant, Edward Clemonts, made the four purchases and was accompanied on three occasions by an undercover state police officer, Matthew Barnwell. A number of police officers and task force personnel provided surveillance and backup support during the purchases.

Three of the four purchases were conducted in a similar manner. Prior to each purchase, Clemonts met

a police officer who took him to the rear parking lot of a hotel in Plainville, which was the assembly point for the purchases. There, Clemonts was searched to ensure that he did not possess any illegal substances. Thereafter, Clemonts was instructed as to the quantity of cocaine he was to purchase from the defendant. Barnwell, who had been given recorded cash, then drove Clemonts to the defendant's residence where he gave Clemonts cash to make the purchase. Clemonts approached the defendant and bought the drugs.[1] Following the purchase, Barnwell and Clemonts returned to the hotel parking lot and gave the cocaine to the police, who field-tested it. The results were positive. Clemonts was then taken to a location of his choice and paid cash ranging in amount from $30 to $120, in consideration of his participation.

The fourth purchase differed in that Clemonts was not accompanied by an undercover officer and there was no prepurchase assembly at the Plainville parking lot. On that occasion, New Britain police Detective Jack Wenz met Clemonts, searched him, gave him purchase money and drove him to the vicinity of the defendant's home. Wenz concealed himself and watched Clemonts walk to the defendant's residence. When Clemonts returned with the cocaine, Wenz obtained a positive field test of the substance and drove Clemonts to a location of his choice. Clemonts never received advance notice of the amount of cocaine he was to purchase and in each instance purchased either an eighth or a quarter ounce of cocaine from the defendant.

Clemonts had known the defendant for fifteen years and lived across the street from him at Pinnacle Heights; the two socialized in the defendant's home. Clemonts bought drugs from the defendant every other day. The

---

[1] The manner in which Clemonts approached the defendant varied from purchase to purchase.

defendant occasionally supplied Clemonts with drugs on credit, a practice known as fronting. Clemonts observed the defendant in his home preparing crack cocaine and engaging in larger drug transactions with other dealers. The defendant enlisted Clemonts' help in selling drugs and paid him in either cash or drugs.

Ian Tardiff was also an original member of the defendant's gang. He verified that from February, 1995, through May, 1996, the gang engaged in drug trafficking throughout New Britain, using violence and intimidation to control the drug traffic in that area, particularly in the public housing projects. Gang members kept one another informed about police activity. Tardiff sold large quantities of drugs to the defendant when the defendant's regular supplier was not available. The defendant also fronted drugs to Tardiff. Edwin "Pooba" Gomez, Melvin Castro and Anthony Walser were the gang's major drug suppliers.

Walser began selling small quantities of cocaine to the defendant during the summer of 1995. These transactions became more frequent over several months. Walser observed the defendant store drugs in a mock beer can with a removable lid. At the end of 1995, Walser sold the defendant 500 grams of cocaine. The defendant also had dealings with Pooba, who was known as a large-scale drug dealer. Walser's relationship with the defendant ended in February, 1996, when Walser was arrested on federal drug charges.

The defendant was arrested at his home on May 3, 1996. Pursuant to a search warrant, police seized the following items from the defendant's home at that time: a quantity of small plastic bags; a pager; a list of police radio frequencies; notes and records of drug transactions in the defendant's handwriting, including references to Pooba; a reminder to engage in "no more

frontin' "; and the fake beer can. No drugs were recovered.

The defendant was transported with others who had been arrested to the holding area of the New Britain police department. The defendant said to Officer Carol Zesut, who was on duty in the holding area: "Blondie, I know where you live. I know what you drive. You drive a blue Trooper. And if it takes me three days eating crackers under your porch, I'm going to get you." Zesut was alarmed by this threat because she did drive a blue Isuzu Trooper and her home had an elevated deck surrounded by lattice work. Because of his reputation, Zesut knew that the defendant was capable of carrying out his threat.

I

The defendant's first claim is that there was insufficient evidence to convict him of conspiracy to distribute narcotics pursuant to §§ 53a-48[2] and 21a-278 (b).[3] We do not agree.

---

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[3] General Statutes § 21a-278 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

"The standards by which we review claims of insufficient evidence are well established. When reviewing a sufficiency of the evidence claim, our courts apply a two-prong test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"It is within the province of the jury to draw reasonable and logical inferences from the facts proven. . . . The jury may draw reasonable inferences based on other inferences drawn from the evidence presented. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . We note that the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. . . . It has been repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether *it* believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . In doing so, we keep in mind that [w]e have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge

their credibility." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Sanchez*, 50 Conn. App. 145, 149–50, 718 A.2d 52, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998).

"To establish the crime of conspiracy under § 53a-48 of the General Statutes, the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of conspiracies, a conviction is usually based on circumstantial evidence. . . . Moreover, it is well settled that conspiracy is a specific intent crime, with the intent divided into two parts: (1) the intent to agree to conspire; and (2) the intent to commit the offense that is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also they intended to commit the elements of the offense. . . .

"Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . In a conspiracy prosecution, when determining both a defendant's specific intent to agree and his specific intent that the criminal acts be performed, the jury may rely on reasonable inferences from facts in the evidence and may develop a chain of inferences, each link of which may depend for its validity on the validity of the prior link in the chain." (Citations omitted; internal quotation marks

omitted.) *State* v. *Torres*, 41 Conn. App. 495, 498–99, 676 A.2d 871 (1996), rev'd on other grounds, 242 Conn. 485, 698 A.2d 898 (1997).

On the basis of our review of the record, we conclude that there was sufficient circumstantial evidence to support the jury's verdict that the defendant intended to and did conspire with others to sell narcotics. The defendant and Tardiff were founding members of a gang the explicit purpose of which was to control the sale of drugs in New Britain. The gang members depended on violence and intimidation. Members of the gang would alert one another when police raids were imminent. Clemonts bought drugs from the defendant for his personal use and also sold them for the defendant. Walser once sold the defendant as much as 500 grams of cocaine in a single transaction. The defendant kept records of his drug transactions and maintained information about police radio frequencies. Clemonts and Tardiff were present in the defendant's home when he sold drugs. Clearly, there was sufficient circumstantial evidence for the jury to conclude that the defendant agreed with others to sell cocaine and took overt action in furtherance of the agreement.

## II

The defendant's second claim is that the prosecutor engaged in a pervasive pattern of misconduct that violated the defendant's right to a fair trial. Specifically, the defendant takes exception to the prosecutor's final argument, claiming that he inappropriately (1) commented on the defendant's failure to testify, (2) commented on facts not in evidence, (3) vouched for the credibility of one of the prosecution's three main witnesses, (4) appealed to the sympathy of the jury and (5) introduced statements against interest evidence after the trial court ruled such evidence inadmissible. The defendant also claims that the pattern of prosecutorial misconduct was pervasive. We are not persuaded.

In his appellate brief, the defendant, who represented himself at trial, concedes that he failed to preserve these claims at trial. On appeal, he argues that the prosecutor's alleged misconduct is reviewable by this court under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[4] and *State* v. *Evans*, 165 Conn. 61, 71–73, 327 A.2d 576 (1973).[5] In analyzing the defendant's claims of prosecutorial misconduct, "we ask whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Sherman*, 38 Conn. App. 371, 376–77, 662 A.2d 767, cert. denied, 235 Conn. 905, 665 A.2d 905 (1995).

"In determining whether prosecutorial misconduct was so serious as to amount to denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are

[4] In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 817, 709 A.2d 522 (1998), quoting *State* v. *Dash*, 242 Conn. 143, 151, 698 A.2d 297 (1997).

[5] "Because *Golding* encompasses the exceptional circumstances of *Evans*, it is not necessary for us to review the defendant's claims under *Evans*." *State* v. *Clark*, 48 Conn. App. 812, 827 n.13, 713 A.2d 834, cert. denied, 245 Conn. 921, 717 A.2d 238 (1998).

the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) Id., 377.

"To prevail on an unpreserved claim of prosecutorial misconduct, the record must reveal a 'pattern of misconduct pervasive throughout the trial or conduct that was so blatantly egregious that it infringed on the defendant's right to a fair trial.' " *State* v. *Clark*, 48 Conn. App. 812, 828–29, 713 A.2d 834, cert. denied, 245 Conn. 921, 717 A.2d 238 (1998).

"In determining whether a prosecutor's conduct was so egregious as to deny a defendant a fair trial, we note that some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . [W]e must review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) Id., 829–30.

A

The defendant first claims that the prosecutor deprived him of a fair trial by commenting on the defendant's failure to testify. The following facts are necessary for our review of this claim.

The prosecutor's alleged impropriety occurred during his rebuttal argument:

"[Prosecutor]: Mr. Kenney has shown himself to be a very quick and clever questioner of witnesses and very articulate when he speaks. He has approached

this case with zeal that rivals many attorneys, and I commend him for that. He has entered into a world, the legal world, and taken it on with both hands, and that is admirable. But that does not erase the incriminating evidence against him. Now, he has mentioned a few things, but the first thing you must keep in mind—I hate to interrupt in front while someone is doing a final argument. But a person can only argue facts that are in evidence, and Mr. Kenney went on and on into areas that were not brought before you. In essence he testified here today, and I didn't have an ability to cross-examine him. The court will instruct you and has instructed you to ignore things that aren't in evidence, and I'd ask you to follow that instruction.

* * *

"But there's the glue, the physical evidence. Specifically, specifically exhibit Q: 'No more frontin'.' Haven't heard anything, anything from Mr. Kenney about that. Haven't heard anything about what this drug record actually could have been other than a drug record. . . . Now, he doesn't have to say anything. Let me make that clear. He doesn't have to testify, and I am not saying that he should have because it is his absolute right not to testify."

At the conclusion of the prosecutor's rebuttal argument, the trial court immediately instructed the jury: "Ladies and gentlemen, in one moment I am going to let you go out for a fifteen minute recess. I want to make one comment. Early in the prosecutor's rebuttal, my recollection is he stated that he did not have an opportunity to cross-examine Mr. Kenney. I want you to ignore that comment by the prosecutor. As you know, and I will tell you in my instruction, Mr. Kenney had an absolute right not to testify—I will go into that further—and the fact he did not have an opportunity to

cross-examine him should not be considered by you at all. That should be ignored."

As part of its charge, the trial court also told the jury. "As you know, the defendant, Mr. Taurus Kenney, did not testify in this case. In a criminal trial, the individual charged with the crime or crimes is under no duty to testify on his own behalf. You may draw no unfavorable inferences from the accused's failure to testify. The law does not compel a defendant to take the witness stand and testify and no presumption of guilt may be raised from the fact that the defendant decides not to testify."

The record is adequate for our review and the claim is of constitutional magnitude, as it is improper for a prosecutor to comment on a defendant's failure to testify. See *State* v. *DeMartino*, 7 Conn. App. 292, 294, 508 A.2d 809 (1986), citing *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). In this instance, however, the prosecutor's commenting on his not having had an opportunity to cross-examine the defendant did not clearly deprive the defendant of a fair trial because the court addressed the comment immediately by way of a curative instruction and again later in its jury charge.

In *State* v. *Lasky*, 43 Conn. App. 619, 685 A.2d 336 (1996), cert. denied, 239 Conn. 959, 688 A.2d 328 (1997), this court stated that "[t]he defendant did not object to the trial court's instructions to the jury that it disregard the improper remarks made during the course of rebuttal argument, nor did the defendant request that the trial court elaborate on the instruction or give additional instructions to the jury concerning that occurrence."

"We first note that our review of the trial court's instruction to the jury regarding the impropriety of the state's argument and the jury's duty to disregard that argument convinces us that the court sufficiently and

forcefully directed the jury's attention to its obligation not to consider that argument. . . . Moreover, we presume, absent a fair indication to the contrary, that the jury followed the instruction of the court as to the law. . . . There is nothing to indicate that the jury failed to follow the instructions of the court and thus the defendant's claim of prejudice is unsupported by the record." (Citations omitted.) Id., 628–29. For those same reasons, we conclude, in the case now before us, that the defendant was not denied a fair trial.[6]

## B

The defendant's second claim is that the prosecutor improperly commented on facts not in evidence. We disagree.

During the first portion of his closing argument, the prosecutor made the following statement. "And, my favorite piece of evidence, exhibit Q. Witnesses testified. There's names: Leafy, Cooch, E-Dog. *Now, I get drug records all the time in cases. I will say this: A drug record, it's a bunch of numbers.* Here, we have names and we know who these people are. They testified who Leafy was. They testified who Cooch was, who Edfar was, who E-Dog was. E-Dog was Ian Tardiff. Ian Tardiff owed 100 bucks. What is here? One hundred bucks." The defendant argues that the highlighted language amounts to expert testimony about the contents of an exhibit. The defendant failed to object to this portion of the prosecutor's argument.

Again, the record is adequate for our review and the claim is of constitutional magnitude, but there is no

---

[6] Regardless of our conclusion that the defendant was not denied a fair trial, we do not in any way condone or accept as proper the prosecutor's comment. As does any person accused of a crime, the defendant had a constitutional right not to testify, and the prosecutor was legally and ethically bound to uphold the sanctity of that constitutional right under any and all circumstances.

clear violation of the defendant's constitutional rights. See *State* v. *Golding*, supra, 213 Conn. 239–40. "A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts which have not been proven amount to unsworn testimony that is not the subject of proper closing argument." (Citations omitted.) *State* v. *Williams*, 204 Conn. 523, 544, 529 A.2d 653 (1987). "While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider. . . . When a verdict is challenged on the basis of the prosecutor's allegedly prejudicial remarks, the defendant bears the burden of proving the remarks prejudicial in light of the whole trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Clark*, supra, 48 Conn. App. 830. "A prosecutor is entitled, however, to comment on reasonable inferences to be drawn from the evidence." Id.

We agree with the state that the challenged comment reasonably may be construed as fair comment on the evidence. The state offered the exhibit as evidence of the defendant's drug dealing. The defendant objected to admitting the document in evidence, claiming that it contained innocent and innocuous material. After the exhibit had been admitted, the jury heard evidence from Officer William Durkin who described the exhibit as a drug transaction record. The defendant did not object to Durkin's testimony. The prosecutor properly commented on the inferences to be drawn from Durkin's testimony concerning exhibit Q.

C

The defendant's third claim of impropriety is that the prosecutor vouched for the credibility of one of the prosecution's three main witnesses. We do not agree.

The following facts are required for our review of this claim. The state produced evidence from Clemonts, Tardiff and Walser, all of whom had been arrested for drug possession and sales. Their testimony corroborated the physical evidence seized at the defendant's home. On cross-examination, the defendant vigorously attacked their credibility. Two days after Clemonts testified, his mother posted bond for him and he was released. The defendant, upon learning of Clemonts' release, called him as a witness to encourage the jury to believe that Clemonts had been released as a reward for his testimony against the defendant.

During his closing argument, the prosecutor stated: "So the question has come down to why believe these witnesses. Why believe them? I believe they are all facing jail time. They have got horrendous records. You know they have cases pending.

"As Mr. Kenney said about Mr. Walser, you are a desperate man. You will do anything. Well, why do we believe them? They all testified without promises. They all want something. They all worded it different ways. Let's see. Mr. Clemonts: 'I hope something good will happen to me.' Well, he is hoping something good will happen to him. He did get out. He did not get out by any aid of the state. His mother came up with his bond, bond he had before he testified. He still faces those charges, and I believe he testified he got out because he feels he is going to do some jail time and he wanted some time out on the street before he did his time. . . . *That doesn't undermine his credibility, the fact that he made bond and got out. Believe me, if I was going to help him, would I do it two days after he testified while this trial was still on? Absolutely not.*" The defendant on appeal objects to the highlighted language. Although it meets the first two prongs of *Golding*, it does not pass the third.

"The prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses." *State* v. *Williams*, supra, 204 Conn. 541. "Such expressions of personal opinion are a form of unsworn and unchecked testimony." Id. "The prosecutor may, however, argue to the jury that the evidence and the reasonable inferences to be drawn therefrom should lead the jury to a conclusion as to the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Clark*, supra, 48 Conn. App. 833.

Here, the prosecutor was not vouching for the credibility of Clemonts. He was addressing the evidence adduced at trial and the inferences the jury reasonably could draw from it.

## D

The defendant's next claim of prosecutorial misconduct is that the prosecutor inappropriately appealed to the sympathy of the jurors by asking them to put themselves in the position of Officer Zesut. We are not convinced.

The state called Zesut to testify about what the defendant said to her when he was in the holding area at the New Britain police station and the effect it had on her. The defendant cross-examined Zesut, asking her whether she had any fearful encounters with him before or after the arrest that is the subject of this prosecution. The defendant also attempted to demonstrate that Zesut's fears were groundless due to his current incarceration and bond status.

During his closing argument, the prosecutor said to the jury, "Threatening. Officer Zesut sat here and she testified. She testified regarding the statements she heard when she was in lockup. I saw her testimony. I know you saw her testimony. And we all heard her say that statement, and we heard it in the calm confines of

this courtroom. And if you think about it in the calm confines of this courtroom or when you go back in the jury room, you are going to be thinking to yourself, 'Hey, what is the big deal.' It happened a long time ago. It was one statement. She has got a gun. What is the big deal here? Do you think of it that way? Yeah. But I submit to you, you have to look at it a little bit different. You have to look at it the way she was having to look at it on May 3, 1996. And how was that? She is in the lockup. The people down there, the prisoners, are very angry. There is a lot of yelling going on. They were part of a gang sweep. She has a feeling about the reputation of that gang.

\* \* \*

"And what happens? The defendant looks angry. He is upset. He looks right at her. They have eye contact. And he states—I will read the quote one more time—'I know where you live. I know you drive a blue Trooper. When I get out of here, I'm going to sit under your stairs for three days eating crackers if I have to get you.' Well, you know, it might sound humorous now, but it wasn't then. Think how you would feel. Think how you would feel if a purported gang member said that to you when he was angry because he was locked up and you are a police officer. Think how you would feel if you listened to this threat and, gosh, you do have a spot in your home where someone could sit underneath, if they wanted, and you do live in New Britain.

"Think about that. How would that make your heart feel at that time because that's what you have to decide in deciding this count. Think about how you would feel. How would it feel, especially when his fellow prisoners start taking up that chant as well. You know you can't always have your guard up. You know you can't always be there to protect your home. You know you can't always be there to protect your daughter. Did he intend

to follow through on that threat? That is not required. Did he intend to terrorize her and upset her? I submit to you he did. And we have charged this two ways: Either that he intended to terrorize her, or even if he didn't intend to terrorize her, his reckless conduct terrorized her. He intended to be just so reckless and say this sort of thing that caused her the feelings that are required under the statute. Again, think about it. Put yourself in her place. Imagine how your heart would pound if that would be said to you, and those facts fit your car, your home, and you lived in that city. I submit to you if you think about it that way, it is not just a little trivial statement that you might perceive it to be when you hear it in the calm confines of this courtroom."

The defendant did not object, but claims on appeal that the argument is an inappropriate appeal to the emotions of the jury. "As a rule, a prosecutor may not resort to such appeals. See [*State* v. *Sherman*, supra, 38 Conn. App. 400]. This does not mean that a prosecutor may not present arguments with logical force and vigor. See *Berger* v. *United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 [1935]." (Internal quotation marks omitted.) *State* v. *Clark*, supra, 48 Conn. App. 833–34.

On the basis of our review of the record, we conclude that the prosecutor's comments were fair comment on the evidence. "A threat imports the expectation of bodily harm, thereby inducing fear and apprehension in the person threatened. A threat, unlike an assault, is not limited by time or distance. It is equally vicious whether made vis-a-vis or over a wall or across a stream, or whether it is uttered by the unaided voice or over a megaphone or is amplified through a loudspeaker. A threat is always an indication of probable evil to come, whether at once or at some certain or uncertain time in the future . . . ." (Internal quotation marks omitted.) *State* v. *Snead*, 41 Conn. App. 584, 593–94, 677

A.2d 446 (1996). The prosecutor's argument, therefore, placed the evidence in the appropriate context for the jury.

## E

The defendant's next claim of prosecutorial misconduct is that the prosecutor introduced evidence of statements against interest after the trial court ruled that such evidence was not admissible. Actually, the defendant's claim is that the prosecutor asked questions of witnesses to bolster their credibility before it was attacked on cross-examination.[7] The defendant, however, did not object to the line of questioning to which his appellate claim is directed, but argues that this claim is reviewable pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. He is mistaken. The issue that the defendant raises is obviously evidentiary, and he cannot prevail under *Golding* because the claim is not of constitutional magnitude. See *State* v. *Robinson*, 227 Conn. 711, 741 n.22, 631 A.2d 288 (1993).

## F

The defendant's final claim as to prosecutorial misconduct is that there was a pattern of pervasive prosecutorial misconduct that denied him the right to a fair trial. As we noted at the outset, for a defendant to

---

[7] The following facts are relevant to our analysis of the defendant's claim. During his questioning of Tardiff on direct examination, the prosecutor asked him if he knew any people in the courtroom and whether they were his friends. The defendant's objection to the line of questioning on the ground of relevance was sustained. The prosecutor then asked Tardiff whether the gang to which he belonged had a rule against helping the police, including testifying at trial. The witness responded in the affirmative and testified that a violation of the rule could result in death. The defendant did not object to the line of questions. When Walser was on the witness stand, the prosecutor asked him during direct examination whether he knew what could happen to him if he helped the police. Walser testified that he could be killed and that the reason he was putting himself in danger was his hope of getting out and seeing his family "on a sooner date." Again the defendant did not object.

prevail on a claim of prosecutorial misconduct, the prosecutor's misconduct must so infect the trial with unfairness that the defendant is denied constitutional due process. Such is not the case before us, where we have found no violation of the defendant's constitutional rights. Furthermore, with one evidentiary exception, the defendant's claims are limited to the prosecutor's closing argument. As to the final argument, "[b]oth this court and our Supreme Court have held that where a criminal defendant does not object and take exception to allegedly prejudicial remarks of the state's attorney, either at the time they were made or at the close of argument, he waives his right to press the claimed error on appeal." (Internal quotation marks omitted.) *State* v. *Clark,* supra, 48 Conn. App. 829.

## III

The defendant's final claims are that the trial court improperly prevented him from effectively preparing for trial and deprived him of his right to prepare and present a defense. We disagree.

The following facts are necessary for our resolution of these claims. At the time of his arrest on May 3, 1996, the defendant's arrest warrant was sealed. On July 8, 1996, the trial court, *Scheinblum, J.,* unsealed the arrest warrant as to the defendant's trial counsel only. On September 30, 1996, the trial court, *Iannotti, J.,* conducted a hearing on the defendant's motion to unseal the arrest and search and seizure warrants as to him, individually. The defendant's counsel argued that the defendant needed to know the names and addresses of the state's lay witnesses and confidential informants in order to assist in his defense. The state objected on the ground that the disclosure would put the witnesses and informants in jeopardy of physical harm and moved for a protective order. The trial court held an in camera hearing on the motion for protective order and ruled

that the identities of the lay witnesses and confidential informants be disclosed to defense counsel thirty days before trial and to the defendant at the time of trial.

On January 10, 1997, the defendant filed a request for a speedy trial, which the trial court granted and informed the defendant that prior to the commencement of trial, the court would permit the defendant to withdraw the speedy trial request so he could have the entire thirty days, pursuant to the protective order, in which to prepare for trial. On February 4, 1997, the defendant moved to discharge his trial counsel and proceed pro se. The trial court denied the motion and defense counsel moved for a competency hearing, where the trial court determined the defendant was competent. After the defendant again moved to proceed pro se, the trial court granted the motion and warned the defendant that he would be held to the same standards as an attorney. The trial court also appointed standby counsel for the defendant. The defendant acknowledged that the state had made full disclosure of the information he had requested and he obtained his former counsel's complete file.

On February 7, 1997, the trial court denied the defendant's motion to dismiss in which he alleged that he was denied due process when he proceeded as his own counsel because he was not given thirty days to review the warrants as his trial counsel had been given. The trial court explained to the defendant that his proceeding with his speedy trial motion was the cause of his not having the thirty day opportunity to review the warrants.

At his sentencing hearing, the defendant complained that he was deprived of effective assistance of counsel when he was permitted to proceed pro se and that the trial court abused its discretion by failing to require the state to disclose the names of the lay witnesses and

confidential informant. These claims are the corner-stone of the defendant's appeal. They are, however, without merit. The deficiencies are of the defendant's own making. He rejected the assistance of counsel and undertook his own defense while pressing for a speedy trial. The defendant is the master of his fate and cannot now complain that he was denied the effective assistance of counsel and that he was denied a fair trial. See *State* v. *Varszegi*, 36 Conn. App. 680, 682–85, 653 A.2d 201 (1995), aff'd, 236 Conn. 266, 673 A.2d 90 (1996).

The judgment is affirmed.

In this opinion the other judges concurred.